# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**DONALD L. WILLIAMS,**

        **Plaintiff,**

-vs-                                           Case No. 2:05-cv-296-FtM-99DNF

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    Plaintiff, Donald L. Williams seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his claim for Disability Insurance Benefits. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions. For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED** pursuant to §205(g) of the Social Security Act, 42 U.S.C. §405(g).

    **I. Social Security Act Eligibility, the ALJ Decision, and Standard of Review**

    The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§416(i), 423(d)(1)(A), 1382a(3)(A); 20 C.F.R. §§404.1505, 416.905. The impairment

must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. §§423(d)(2), 1382(a)(3); 20 C.F.R. §§404.1505 - 404.1511, 416.905 - 416.911. Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

On June 28, 2002, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), asserting a disability onset date of March 15, 2001. (Tr. p. 81-83). His claim was denied initially on November 20, 2002, and upon reconsideration on March 27, 2003. (Tr. p. 44-51). A hearing was held before Administrative Law Judge José G. Rolón-Rivera ("ALJ") on June 16, 2004, and a supplemental hearing was held on September 7, 2004. (Tr. p. 254-314). The ALJ's decision dated January 25, 2005, denied Plaintiff's claim for benefits. (Tr. p. 17-29). At Step 1, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability of March 14, 2001. (Tr. p. 27). At Step 2, the ALJ found Plaintiff had back pain, status post left L 3-4 complete facetectomy, foraminotmy and microsurgical discectomy for far lateral disc herniation left L3-4. (Tr. p. 28), which is an impairment or a combination of impairments considered "severe" based on the requirements in 20 C.F.R. §404.1520(c). (Tr. p. 28). At Step 3, the ALJ found Plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (T. p. 28). The ALJ did not find Plaintiff's allegations regarding his limitations to be totally credible. (Tr. p. 28). At Step 4, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (Tr. p. 28). At Step 5, based upon a residual functional capacity ("RFC") for a significant range of light work, Plaintiff's age, education, and lack of transferable skill, the ALJ applied the Medical-Vocational Guidelines and considered the testimony of the vocational expert, and found that there are

a significant number of light, unskilled jobs in the national economy that he could perform. (Tr. p. 28). Accordingly, the ALJ found that Plaintiff was not disabled. (Tr. p. 28). Plaintiff sought review by the Appeals Council, which denied review on May 27, 2005. (Tr. p. 7-10). Plaintiff sought review of this decision by the United States District Court on June 27, 2005. (Doc. 1).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *Crawford v. Commissioner of Social* Security, 363 F.3d 1155, 1158 (11th Cir. 2004), *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Crawford,* 363 F.3d at 1158, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Id*. at 1158-9, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Shinn ex rel. Shinn v. Commissioner of Social Security*, 391 F.3d 1276, 1282 (11th Cir. 2004), Crawford, 363 F.3d at 1158, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery*

*v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**II. Review of Facts and Conclusions of Law**

**A. Background Facts**

Plaintiff was born on October 6, 1953, and was 50 years old at the first hearing held on June 16, 2004. (Tr. p. 81, 256-7). Plaintiff has a tenth grade education. (Tr. p. 257). His past work experience was as a sod cutter. (Tr. p. 258). In March 2001, the Plaintiff was working on a piece of equipment, the tire broke off the machine, and he was tossed around. (Tr. p. 265). After the accident he worked another week or so and then could not continue working. (Tr. p. 267-8). He could hardly walk. (Tr. p. 268). He went to a doctor who prescribed medication, gave him some shots, and prescribed therapy. (Tr. p. 269-70). The doctor recommended that he not return to work for 3 months. (Tr. p. 269). In July 2001, Plaintiff had back surgery for two cracked discs. (Tr. p. 271). Plaintiff began receiving Workers Compensation. (Tr. p. 271). In October 2001, Dr. Corenti, his Workers Compensation doctor, told him he could return to work so his Workers Compensation ended. (Tr. p. 272). Plaintiff testified that he did not go back to work because he was unable to work. (Tr. p. 272). Since February 2004, the Plaintiff was taking medication for depression. (Tr. p. 276). At the conclusion of the first hearing, the ALJ requested that counsel for Plaintiff obtain a residual functional capacity assessment for Plaintiff's treating physician or the ALJ would schedule a consultative orthopedic evaluation of Plaintiff. At the second hearing held on September 7, 2004, Plaintiff testified that he recently saw a neurosurgeon who told him his back was in bad shape, and that it was fusing together on its own. (Tr. p. 289-90).

Plaintiff testified that his day consists of staying home, cooking dinner, cleaning the house, and washing clothes. (Tr. p. 293). He also watches television. (Tr. p. 293). His wife works, and he stays home to houseclean, cook, and pick up the children. (Tr. p. 293). He used to shoot pool, but after the accident he was unable to shoot pool. (Tr. p. 298). He was able to drive to the hearing, and drive to his doctors' appointments. (Tr. p. 295).

### B. Vocational Expert Testimony

A Vocational Expert, Joyce Ryan, testified at the second hearing before the ALJ. (Tr. p. 301). Ms. Ryan testified that Plaintiff's past relevant work as a sod cutter and stacker is classified as up to the heavy level of exertion and is unskilled. (Tr. p. 302). According to Plaintiff's testimony, Ms. Ryan classified the actual job that Plaintiff performed as a medium level of exertion. (Tr. p. 302). Ms. Ryan was handed Exhibit 15F which was the Pain Interrogatory. (See, Tr. p. 245-247, 302-3). If the ALJ gave credence and weight to this document, then Ms. Ryan opined that Plaintiff would not be able to perform his past relevant work or any work in the national economy. (Tr. p. 303).

Ms. Ryan was asked if she had reviewed Exhibit 11F which is the Physical Residual Functional Capacity Assessment dated March 21, 2003. She had reviewed the exhibit. (See, Tr. p. 204-11, 304). If the ALJ gave credence and weight to this document and Ms. Ryan was to consider Plaintiff's age, education and work experience, then Ms. Ryan opined that Plaintiff could perform sedentary and light unskilled work. (Tr. p. 304-5). Ms. Ryan determined that there were jobs in the national economy for Plaintiff to perform, such as a final assembler of optical goods, a jewelry preparer, and a wafer breaker for semi-conductors. (Tr. p. 305). There are also jobs available in the local economy. (Tr. p. 306). These jobs would have minimal flexibility as to changing positions.

(Tr. p. 306). These jobs would be for someone 49 years old or younger because Plaintiff has no transferable skills. (Tr. p. 308).

At the light work level, Ms. Ryan found that there were jobs in the national economy and local economy such as assembling, grading, sorting and light machine tending and inspecting. (Tr. p. 306). These jobs are standing or sitting jobs with lifting up to 20 pounds such as a sewing machine operator. (Tr. p. 307). There are jobs with flexibility in standing and sitting, such as cashier. (Tr. p. 307, 309). These jobs would be for someone 54 years of age or younger. (Tr. p. 308).

Ms. Ryan was asked if she had reviewed Exhibit 9F which is the Physical Residual Function Capacity Assessment dated November 20, 2002. She had reviewed the exhibit. (See, Tr. p. 182-189, 309). If the ALJ gave credence and weight to this document and Ms. Ryan was to consider Plaintiff's age, education and work experience, then Ms. Ryan opined that in her opinion, there would be jobs available. (Tr. p. 309). Ms. Ryan was asked to review Exhibits 10F and 7F which were Psychiatric Review Technique reports dated March 1, 2003, and October 31, 2002. (Tr. p. 164-177, 190-203, 309). After review of these Exhibits, Ms. Ryan testified the her opinion would be the same. Ms. Ryan testified that if credence was given to Plaintiff's subjective complaints of pain, there would be no jobs that Plaintiff was able to perform. (Tr. p. 311).

### C. Medical History

On March 19, 2001, Plaintiff went to Robert Caignet, D.O. for left side lumbar pain. (Tr. p. 131). Plaintiff told Dr. Caignet that his back pain began after a tractor accident on March 8, 2001. (Tr. p. 131). Plaintiff complained that the pain radiated down his legs. (Tr. p. 131). Dr. Caignet

diagnosed Plaintiff with lumbar strain and prescribed certain medications. (Tr. p. 131). On March 26, 2001, Plaintiff returned to Dr. Caignet telling the doctor that he was much better with some slight tenderness. (Tr. p. 131). Dr. Caignet recommended physical therapy, and continued Plaintiff on light duty. (Tr. p. 131). On April 17, 2001, Plaintiff returned to Dr. Caignet complaining of a great deal of back pain which radiated down his left thigh and knee. (Tr. p. 130). Dr. Caignet scheduled and MRI, prescribed Vicoprofen, and kept him on light duty. (Tr. p. 130). Plaintiff elected not to work rather than light duty. (Tr. p. 13).

On April 25, 2001, an MRI was taken of Plaintiff's back. The doctor found that the vertebral body height and alignment were well maintained with some desiccation of the disc at L4-5 and L5-S1. (Tr. p. 136). Moderate loss of disc space was noted at L5-S1. (Tr. p 136). The doctor found mild diffuse bulging at L3-4, and moderate facet hypertrophy with minimal canal stenosis. (Tr. p. 136). Mild to moderate diffuse bulging was noted at L4-5 and L5-S1, and moderate narrowing of the neural foramina and mild facet hypertrophy. (Tr. p.1 36). The doctor concluded that there was minimal anterior spondylolisthesis of L3 in relation to L4 and moderate spondylosis at this level as well. (Tr. p. 137). The doctor also found mild spondylosis at L4-5 with minimal spondylosis L5-S1. (Tr. p. 137). On May 2, 2001, Plaintiff went to Dr. Caignet complaining of pain off and on in his back with some radiation. (Tr. p. 129). Dr. Caignet reviewed the MRI and recommended that Plaintiff see a neurosurgeon. (Tr. p. 129). His prescription for Vicoprofen was renewed. (Tr. p. 129).

On May 16, 2001, Plaintiff went to Gary J. Correnti, M.D. and neurosurgeon complaining of low back and bilateral leg pain. (Tr. p. 145). Dr. Correnti found tenderness in the lumbar spine. (Tr. p. 146). Dr. Correnti found Plaintiff had lumbar strain, far lateral herniated nucleus pulposus L3-4 on the left with L3 left nerve compression, Grade 1 spondylolisthesis L3-4 and mild to moderate

central stenosis and mild central stenosis L4-5. (Tr. p. 147). Dr. Correnti prescribed physical therapy for Plaintiff as well as a Medrol Dosepak. (Tr. p. 147). He also excused him from work until the physical therapy was completed, for approximately four to five weeks. (Tr. p. 147).

On July 31, 2001, Plaintiff had a complete facetectomy, foraminotomy, and microsurgical discectomy with decompression of his Left L3-4 and far lateral L3 nerve root at Southwest Florida Regional Medical Center. (Tr. p. 148). The surgeon was Dr. Correnti. (Tr. p. 148). Plaintiff tolerated the procedure well. (Tr. p. 151).

On August 15, 2001, Plaintiff visited Dr. Correnti for a neurosurgical follow-up. (Tr. p. 144). Plaintiff reported that he was doing better. (Tr. p. 144). He no longer had pain reaching his knee or on the medial thigh. (Tr. p. 144). He still had some pain in the lateral portion of the left thigh and spasms in his low back. (Tr. p. 144). Dr. Correnti recommended physical therapy and expected him to be back at work in 10 to 12 weeks from surgery. (Tr. p. 144). On October 17, 2001, Plaintiff returned to Dr. Correnti reporting that the pain in his left leg was gone, that he had some pain in his lower back, and a mild ache in his right buttocks region. (Tr. p. 143). Dr. Correnti noted that his flexibility improved and he had normal strength and sensation in his legs. (Tr. p. 143). Dr. Correnti kept him from working until his next visit, but sent him for a Functional Capacity Evaluation to determine what type of work he could do. (Tr. p. 143). On November 14, 2001, Dr. Correnti reviewed the Functional Capacity Evaluation and determined that Plaintiff could return to work on November 19, 2001. The Functional Capacity Evaluation found that Plaintiff could work at a medium work level. (Tr. p. 142).

On December 4, 2001, Plaintiff had an MRI. The doctor compared the filings to his MRI of April 25, 2001. (Tr. p. 134). The doctor found that the vertebral body height was well maintained, and

there was minimal anterior spondylolisthesis of L3 in relation to L4. (Tr. p. 134). A prominent Schmorl's node was identified, and desiccation of the discs at L3-4, L4-5, and L5-S1 was noted. (Tr. p. 134). The doctor found mild bulging of the disc at L1-2, mild narrowing, and mild facet hypertrophy. (Tr. p. 134). There was also mild bulging at L4-5, and L5-S1, with mild facet hypertrophy and mild to moderate narrowing of the exiting neural foramina. (Tr. p. 135). No canal stenosis was identified. (Tr. p. 135). There was a suggestion of epidural fibrosis at L3-4. (Tr. p. 134). The doctor concluded that there was Grade I anterior spondylolisthesis of L3 in relation to L4, post surgical changes with epidural fibrosis identified surrounding the left aspect of the thecal sac and extending into the existing nerve root. (Tr. p. 135). He also concluded that the Plaintiff had mild spondylosis of L4-5, L5-S1, and L1-2. (Tr. p. 135).

On December 19, 2001, Plaintiff visited Dr. Correnti for continued low back pain. (Tr. p. 141). Dr. Correnti found the pain to be muscular, compared the December MRI with the April MRI and found no evidence of recurrent or residual disc herniation. (Tr. p. 141). Dr. Correnti believed that if Plaintiff continued on his home exercise program he would feel better. Dr. Correnti found that Plaintiff could return to work with no restrictions. (Tr. p. 141). On April 24, 2002, Plaintiff went to Dr. Correnti complaining of pain in his left hip area. (Tr. p. 140). Dr. Correnti found that it was most likely a muscular problem unrelated to nerve root irritation. (Tr. p. 140). Dr. Correnti recommended over the counter pain medication, but Plaintiff asked for more prescription pain medication. (Tr. p. 140). Dr. Correnti prescribed Percocet and told Plaintiff this would be his last prescription of pain medication. (Tr. p. 140). On July 25, 2002, Plaintiff went to Dr. Correnti with pain in the region of his left iliac crest. (Tr. p. 139). Dr. Correnti examined him and noted that he walked with a normal gait. (Tr. p. 139). Dr. Correnti ordered an MRI of Plaintiff's left hip and

lumbar spine. (Tr. p. 139). He prescribed Ultram. (Tr. p. 139). After reviewing the MRI on August 21, 2002, Dr. Correnti concluded that here was nothing from a neurosurgical aspect that he could do for Plaintiff. (Tr. p. 138). Plaintiff's condition had not changed, and Dr. Correnti's conclusions of December 19, 2001, that Plaintiff could return to work with no restrictions remained his opinion in August 2002. (Tr. p. 138). Dr. Correnti referred Plaintiff to a physiatric or chronic pain management facility. (Tr. p. 138).

On September 23, 2002, Plaintiff went to Peter Schreiber, D.O. for a physiatric consultation. (Tr. p. 162). Plaintiff complained of severe pain in his left lumbosacral area, with numbness and tingling. (Tr. p. 162). Plaintiff ambulated normally. (Tr p. 163). Dr. Schreiber prescribed muscle relaxers, Ultracet, a TENS unit, and physical therapy. (Tr. p. 163). Dr. Schreiber estimated that Plaintiff had a work restriction of 25 pounds maximum. (Tr. p. 163).

On October 14, 2002, Plaintiff returned to Dr. Schreiber complaining of deep pain in his low back. (Tr. p. 161). Dr. Schreiber stopped the muscle relaxers, continued with Ultracet, and the TENS unit, and asked that Plaintiff perform a home exercise program and prescribed ThermaCare back wraps. (Tr. p. 161). Dr. Schreiber also encouraged Plaintiff to seek employment with a lifting restriction of 25 pounds maximum. (Tr. p. 161).

On November 13, 2002, Plaintiff went to S.V. Nagarathinam, M.D. for a disability physical. (Tr. p. 178). Dr. Nagarathinam found no tenderness over the spine but did find a paravertebral muscle spasm in the left lumbar area. (Tr. p. 179). Plaintiff was found to have a normal range of movements, normal straight leg raising, and normal gait. (Tr. p. 179).

On November 14 and December 3, 2002, Plaintiff returned to Dr. Schreiber complaining of low back pain and Dr. Schreiber gave him an injection for the pain. (Tr. p. 159-160). Dr. Schreiber

did not change his work restrictions. (Tr. p. 159-160). Plaintiff reported the injections worked well (Tr. p. 159). Dr. Schreiber continued his current work restriction. (Tr. p. 159). On February 26, 2003, Plaintiff saw Dr. Schreiber for complaints of pain in the lumbar area exacerbated with bending, stooping, and twisting. (Tr. p. 219). Dr. Schreiber prescribed refills on Flexeril, Soma and Ultracet. (Tr. p. 219). On March 19, 2003, Dr. Schreiber injected Plaintiff with Medrol, Sarapin and Marcaine. (Tr. p. 218). Plaintiff reported on March 25, 2003, that the injection did not work and he was in pain. (Tr. p. 217). Dr. Schreiber ordered x-rays of the lumbar spine, and prescribed Motrin, and Darvocet. (Tr. p. 217). The flexion-extension lumbar spine x-rays were taken on July 3, 2003 (Tr. p. 214), and upon review by Dr. Schreiber, he found a 5mm anterior subluxation of L3 and L4 which is stable. (Tr. p. 213). He recommended that Plaintiff be referred to Dr. S. Bobman for lumbar discogram, and he refilled the Darvocet. (Tr. p. 213).

On December 3, 2003, Plaintiff went to Dr. Schreiber to discuss a discogram that was performed on November 20, 2003. (Tr. p. 240, 241-244). The L3-4 disc showed annular fissuring and 7/10 concordant pain. (Tr. p. 240). The L4-5 disc showed some annular fissuring and 9/10 concordant pain. (Tr. p. 240). The L5-S1 disc showed annular degeneration and tearing and 8/10 concordant pain. The L-3 discogram, which was used as the control level, elicited 3/10 concordant pain. (Tr. p. 240). Dr. Schreiber suggested Plaintiff see a neurosurgeon, and prescribed Vicodin. (Tr. p. 240). On December 11, 2003, Plaintiff went to Dr. Correnti complaining of low back pain. (Tr. p. 237). Dr. Correnti recommended Lumbar fusion of the L3-4, L4-5, and L5-S1 for reduction of instability of the spine and to help treat the pain. (Tr. p. 239). Plaintiff was unsure if he wanted the procedure done due to pending litigation, and due to socioeconomic factors. (Tr. p. 239). On December 19, 2003, Plaintiff went to Dr. Schreiber for pain. (Tr. p. 236). Dr. Schreiber refilled

Plaintiff's Vicodin, and took him off work until Plaintiff was approved for surgery through workers compensation. (Tr. p. 236). On January 14, 2004, Plaintiff went to Dr. Correnti for severe low back pain radiating to the back of his legs and to his buttock. (Tr. p. 228). Dr. Correnti recommended scheduling a L3-4, L4-5 and L5-S1 lumbar fusion. (Tr. p. 228). In March 2004, Plaintiff saw Dr. Schreiber for chronic lumbar and hip pain. (Tr. p. 234). Dr. Schreiber prescribes Norco, Motrin, and Effexor for his depressed mood. (Tr. p. 234). On April 21, 2004, Plaintiff returned to Dr. Schreiber who changed and refilled prescriptions. (Tr. p. 233).

On June 25, 2004, Dr. Schreiber completed a Pain Interrogatory which stated that Plaintiff was "unable to work in any capacity at this time." (Tr. p. 245-246). He also found that Plaintiff was never able to bend, kneel, squat, crawl, climb stairs, or climb ladders, and Plaintiff's limitations were extreme as to being able to maintain a schedule or complete a normal work day and work week without interruption. (Tr. p. 247). On August 16, 2004, Plaintiff went to Michael Lusk, M.D. for an Independent Medical Exam complaining of low back pain and occasional leg pains. (Tr. p. 250). Dr. Lusk agreed that Plaintiff would need fusions of L3-4, L4-5, and L5-S1. (Tr. p. 252). Dr. Lusk determined that Plaintiff could perform intermittent sedentary light work on a part-time basis if his back pain permitted it, but Plaintiff could not ever return to his past relevant work. (Tr. p. 252).

### D. Psychological History

On September 20, 2002, Plaintiff was seen by Harald Lettner, Ph.D for psychological screening. (Tr. p. 156). Dr. Lettner found Plaintiff to have clinical depression in response to his injuries, chronic pain, his limitations, his disabilities, and his losses. (Tr. p. 18). Dr. Lettner determined that Plaintiff's emotional status interferes with his ability to work, however, if he began

working then his emotional status would revert to normal. (Tr. p. 158). Dr. Lettner found it unlikely that Plaintiff would obtain gainful employment even if his physical condition improved. (Tr. p. 158). Dr. Lettner found Plaintiff would benefit from pain management and antidepressant medication. (Tr. p. 158). His diagnosis was major depression, single episode, severe, without psychotic features. (Tr. p. 158).

### E.  State Evaluations

On October 31, 2002, a Psychiatric Review Technique form was completed. (Tr. p. 164). The reviewer found Plaintiff's impairments were not severe. (Tr. p. 164). The reviewer found Plaintiff had disturbance of mood, and depressive disorder. (Tr. p. 167). The reviewer found Plaintiff to have mild functional limitations as to difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. p. 174). The reviewer concluded that Plaintiff was limited by his physical condition and pain to some extent but Plaintiff acknowledged his ability to perform routine tasks. (Tr. p. 176). The reviewer determined that Plaintiff experienced some depression related to his medical problems, however the depression was not severe, and Plaintiff had an adequate mental state and could relate in a socially adequate manner. (Tr. p. 176). The reviewer found that Plaintiff was functional from a mental perspective. (Tr. p. 176).

A Physical Residual Functional Capacity Assessment was completed on November 20, 2002. (Tr. p. 182). The reviewer found Plaintiff able to lift 20 pounds occasionally and 10 pounds frequently. (Tr. p. 183). The reviewer also found that Plaintiff was able to stand or walk for 6 hours in an 8 hour workday, and sit for 6 hours in an 8 hour workday. (Tr. p. 183). He found that Plaintiff

an no limits for push or pull. (Tr. p. 183). The reviewer determined that Plaintiff could climb, balance, stoop, kneel, crouch, and crawl frequently, but no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. p. 184-186). The reviewer considered Plaintiff's complaint of pain in assigning a light residual functional capacity. (Tr. p. 187).

A second Psychiatric Review Technique was completed on March 1, 2003. (Tr. p. 190). The reviewer found Plaintiff's impairments were not severe and that he had coexisting nonmental impairments that require referral to another medical speciality. (Tr. p. 190). The reviewer also determined that Plaintiff had "MDD" (major depressive disorder). (Tr. p. 193). He found the Plaintiff was mildly limited in activities of daily living, maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. p. 200). The reviewer concluded that Plaintiff's mental condition was not severely limiting. (Tr. p. 203).

A second Physical Residual Functional Capacity Assessment was completed on March 21, 2003. (Tr. p. 204). The reviewer found Plaintiff able to lift 20 pounds occasionally and 10 pounds frequently. (Tr. p. 205). He found Plaintiff could stand, walk or sit for 6 hours in an 8 hour workday. (Tr. p. 205). He found his push and pull capabilities to be unlimited. (Tr. p. 205). The reviewer found that Plaintiff could climb, balance, stoop, crouch and crawl occasionally and kneel frequently. (Tr. p. 206). He determined that Plaintiff had no manipulative limitations, no visual limitations, no communicative limitations but was to avoid heights. (Tr. p. 208). The reviewer limited Plaintiff to light work. (Tr. p. 209).

### F. Specific Issues

Plaintiff raises two issues on appeal. As stated by Plaintiff, they are: (1) the ALJ improperly dismissed plaintiff's treating doctor's opinion; and (2) the ALJ erred by relying on the vocational expert's response to an inaccurate hypothetical question.

### 1. Treating Physician's Opinion

Plaintiff argues that the ALJ did not give proper weight to the opinion of Plaintiff's treating physician, Dr. Schreiber. Specifically, in June 25, 2004, Dr. Schreiber indicated that Plaintiff was "unable to work in any capacity at this time." (See, Tr. p. 245-246). Plaintiff argues that Dr. Schreiber was Plaintiff's treating physician for his musculoskeletal problems for several years, and Dr. Schreiber witnessed and documented Plaintiff's medical condition deteriorate to the point where a spinal fusion was recommended. Dr. Schreiber also found that Plaintiff was never able to bend, kneel, squat, crawl, climb stairs, or climb ladders, and Plaintiff's limitations were extreme as to being able to maintain a schedule or complete a normal work day and work week without interruption. (See, Tr. p. 247). The ALJ considered Dr. Schreiber's statement of June 25, 2004, and determined that his statements were not consistent with the other evidence in the record and with Plaintiff's own reported activities. (Tr. p. 23). The ALJ noted that Plaintiff was advised to return to work with no restrictions in December 2001 after a review of his MRI, was advised to return to work in April 2002, and again in August 2002. (Tr. p. 23). The ALJ cited to Dr. Schreiber who encouraged Plaintiff to seek employment with a 25 pound lifting restriction in October 2002. (Tr. p. 23). The ALJ also noted that Dr. Lusk who conducted an Independent Medical Examination indicated that sedentary or light work were not precluded in August 2004. (Tr. p. 23). The ALJ concluded that Dr. Schreiber's assessment of June

25, 2004, was not consistent with the medical record as a whole and he did not give it controlling weight.

Ordinarily, an ALJ must give substantial or considerable weight to the testimony of a treating physician unless good cause is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004), citing, Lewis *v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), *see also*, *Morrison v. Barnhart*, 278 F.Supp.2d 1331, 1334 (M.D. Fla 2003), *citing Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). An ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician and the failure to do so is reversible error. *Lewis,* 125 F.3d at 1440. For good cause to be shown, the ALJ must show that the opinion of the treating physician is not supported by the evidence or the treating physician's opinion is conclusory or inconsistent with the medical records. *Id*. Further, a treating physician's opinion must be supported by medically acceptable clinical and laboratory diagnostic techniques to be given controlling weight. *Patterson v. Chater*, 983 F.Supp. 1410, 1414 (M.D. Fla. 1997), *citing,* 20 C.F.R. §404.1425(e). If an ALJ fails to state a reasonable basis for the rejection of a treating physician's opinion, the opinion will be accepted as true as a matter of law. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The medical record after Plaintiff's accident in March 2001 has many instances where his treating physicians including Dr. Schreiber recommended that Plaintiff return to work. After Plaintiff's surgery in July 31, 2001, Dr. Correnti expected Plaintiff to return to work in 10 to 12 weeks. In November 2001, Dr. Correnti determined that Plaintiff could return to work and could work at a medium work level. In December 2001 and again in August 2002, Dr. Correnti found Plaintiff could return to work with no restrictions. In September 2002, Dr. Schreiber examined Plaintiff and determined that he could work with a restriction of 25 pounds maximum for lifting. In October 2002,

Dr. Schreiber even encouraged Plaintiff to seek employment with a 25 pound lifting restriction. In November and December 2002, Dr. Schreiber did not change Plaintiff's work restrictions. From the record, it is clear that in early 2004, Plaintiff's doctors recommended a lumbar fusion to relieve Plaintiff's pain. Plaintiff did not have the lumbar fusion at that time due to pending litigation and socioeconomic concerns. On June 25, 2004, Dr. Schreiber completed a Pain Interrogatory and wrote that Plaintiff was unable to work in any capacity at this time. He also listed other restrictions.

The ALJ clearly considered Dr. Schreiber's opinions including the Pain Interrogatory of June 25, 2004. The ALJ found that Dr. Schreiber's opinion was not supported by the weight of the medical records. His opinion contradicted the medical records from Dr. Correnti as well as Dr. Schreiber's own medical records and opinions from earlier dates. Further, the ALJ considered Plaintiff's testimony of his daily activities which included cooking, cleaning and washing clothes, and determined that Plaintiff's subjective complaints of pain were not totally credible. The Court determines that the ALJ stated a reasonable basis for the rejection of Dr. Schreiber's one opinion that Plaintiff was unable to work at that time. Therefore, the ALJ did not err in disregarding Dr. Schreiber's opinion of June 25, 2004.[1]

**2. Vocational Expert and Hypothetical Question**

Plaintiff argues that when writing his opinion, the ALJ relied on hypotheticals that only included the examining doctors' opinions and did not include Dr. Schreiber's opinion that Plaintiff suffered from severe lumbar pain and was unable to work in any capacity. The ALJ handed the

---

[1] The Court notes that Dr. Schreiber's opinion of June 25, 2004, does not state a beginning date for the disability nor the duration of the disability and the inability to do any substantial gainful activity. The Plaintiff bears the burden of showing his inability to do substantial gainful activity due to his disability will last for a continuous period of not less than twelve months. *See*, 42 U.S.C. §§416(i), 423(d)(1)(A), 1382a(3)(A); 20 C.F.R. §§404.1505, 416.905.

vocational expert, Ms. Ryan, Dr. Schreiber's Pain Interrogatory, and she found that Plaintiff would not be able to perform any work in the national economy.  When the ALJ, asked Ms. Ryan to give credence to Plaintiff's subjective complaints of pain, Ms. Ryan opined that there were no jobs in the national economy that Plaintiff was able to perform.

The ALJ handed Ms. Ryan the Physical Residual Functional Capacity Assessment of March 21, 2003, and after review and consideration of Plaintiff's age, education and work experience, Ms. Ryan found that Plaintiff could perform sedentary and light unskilled work.  After review of the Physical Residual Functional Capacity Assessment of November 20, 2002, Ms. Ryan opined that there were even more jobs available to Plaintiff because of there being less postural limitations.

Once the ALJ had determined that a claimant can no longer perform his past relevant work, the burden then shifts to the Commissioner "'to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.'" *Jones v. Apfel*, 190 F.3d 1224, 1228-9 (11th Cir. 1999), citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  When the claimant has non-exertional impairments, such as pain, that significantly limits basic work skills, then reliance on the grids is inappropriate, and the Commissioner's preferred method of showing that a claimant can perform other jobs in the economy is through the testimony of a vocational expert. *Jones v. Apfel*, 190 F.3d at 1229.  In order for the testimony of a vocational expert to constitute substantial evidence,  the ALJ must pose a hypothetical question which includes all of the claimant's impairments.  *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002)*, citing Jones v. Apfel*, 180 F.3d at 1229.

The ALJ determined that Dr. Schreiber's opinion of June 25, 2004, was not supported by substantial evidence from the medical records. Therefore, the ALJ did not rely upon Ms. Ryan's

opinion when she gave full credence to Dr. Schreiber's opinion of June 25, 2004. Rather, the ALJ relied upon Ms. Ryan's opinion when he provided in his hypothetical all evidence that was supported by the medical records. The ALJ did not err in considering Ms. Ryan's opinion as substantial evidence in his decision.

### III. Conclusion

Accordingly, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence. It is recommended that a judgment should be entered pursuant to sentence four of 42 U.S.C. §§405(g) and 1383(c)(3), **AFFIRMING** the decision of the Commissioner. It is further recommended that the Clerk of Court be instructed to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this 26th day of May, 2006.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:

All Parties of Record